IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

Plaintiff,

Vs.                                         No.  00-40024-06-SAC

CHARLES WILLIAM HOPKINS,

Defendant.

MEMORANDUM AND ORDER

The case comes before the court on the Tenth Circuit's remand to resentence the defendant.  The appellate panel concluded that the sentencing court had employed an improper methodology in determining drug quantity under the guidelines and that the court's drug quantity determination was not supported by the evidence of record.  On remand, the sentencing court set dates for the filing of sentencing memoranda and conducted an evidentiary hearing.  The parties filed supplemental sentencing memoranda after the hearing.  The issues on resentencing are now ripe for ruling.

**BACKGROUND**

On April 16, 2002, the jury found the defendant guilty of the conspiracy count charged in count one and not guilty of counts ten and eleven that

charged the defendant with using a communication facility on January 26 and 27, 2000, to commit a drug conspiracy offense. The jury further found that the government had not proved beyond a reasonable doubt that the defendant had conspired to manufacture or distribute at least 50 grams of a mixture or substance containing a detectable amount of methamphetamine. For sentencing purposes, the jury's verdict means the defendant faces no mandatory minimum sentence and may not be sentenced to more than twenty years imprisonment.

No modifications have been made to the Presentence Report ("PSR") used in the first sentencing. It recommends a base offense level of 38 for the amount of drugs with a two-point enhancement for possession of a firearm and a two-point enhancement for obstruction of justice for a total offense level of 42. The sentencing guideline range for an offense level of 42 and a criminal history category of one is 360 months to life. By reason of the jury's verdict, the defendant's guideline range is the statutory maximum of not more than twenty years.

In arriving at the base offense level of the 38, the PSR recommends the following relevant conduct finding:

> Charles W. Hopkins was providing Shane Wright with chemicals, glassware, and other chemistry related items for Shane Wright's use to produce methamphetamine. In exchange, the defendant was receiving

2

methamphetamine from Wright for personal use and resale.  It is not clear from statements of codefendants in this case when the defendant began providing the chemicals and glassware to Wright.  However, statements and testimony provided by others do indicate the defendant was receiving methamphetamine from Wright since at least 1999.  <u>The defendant contributed to the furtherance of Wright's methamphetamine manufacturing operation by providing chemicals and glassware for the operation, and by destroying evidence from Wright's property in January 2000, in attempt to conceal the operation.</u>  <u>Due to this, the defendant is responsible for at least the quantity of methamphetamine produced by Shane Wright from January 2000, until the raids and subsequent arrests of the defendant and codefendants in this case in March 2000.</u>  In a two-month period, Shane Wright produced approximately 16 pounds (7.25 kilograms) of actual methamphetamine.

(PSR at ¶ 82) (underlining added).  Thus, the PSR holds the defendant accountable only for the methamphetamine manufactured between the months of January and March of 2000 and estimates this amount from the manufacturing levels prior to January of 2000.  As the Tenth Circuit observed, the PSR "concluded that Hopkins was not responsible for any of the drugs produced by the conspiracy prior to the January 2000 concealment of the evidence."  (Dk. 1957, pp. 7-8).

        The addendum to the PSR shows the government's only objection was to the lack of an obstruction of justice enhancement, and the probation officer subsequently modified the PSR to include this enhancement.  The defendant, however, filed a number of objections and requested a downward departure.  The government opposed both the objections and the downward departure request and

called for a sentence of twenty years.

Just before the first sentencing hearing, the district court filed a memorandum and order of some length that addressed all of the unresolved matters identified in the PSR addendum. (Dk. 1668). At the hearing, the parties were given the opportunity to present their arguments and evidence. The court then imposed a sentence of 121 months of imprisonment with supervised release of three years.

The defendant appealed arguing the court improperly enhanced his sentence for possession of a dangerous weapon and obstruction of justice and erred in calculating the amount of drugs in excess of the jury's verdict based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000)*, Blakely v. Washington*, 124 S. Ct. 2531 (2004)*,* and *United States v. Booker*, 125 S. Ct. 738 (2005). The government cross-appealed arguing a misapplication of the Guidelines in determining the amount of drugs attributable to the defendant. (Dk. 1957, pp. 1-2).

The Tenth Circuit found the sentencing court had erred and remanded for resentencing. The panel mentioned without deciding the defendant's claim on appeal that the government had submitted insufficient evidence to support the sentencing enhancement. The panel, however, directed the sentencing court on remand to consider the defendant's claim. The panel devoted their attention to whether the sentencing court used a proper methodology in determining drug

4

quantity and whether substantial evidence of record supported that determination. In so doing, the panel analyzed the following portion of the district court's written order:

> Based on the credible and reliable evidence presented at trial, as well as the jury's verdict on the charges against this defendant, the court finds that the government has carried its burden of proving that the defendant Charles Hopkins should be held accountable for 21 grams of a methamphetamine mixture and 28.35 grams of actual methamphetamine or 325 kilograms of marijuana for an offense level of 26. The court bases this finding on the evidence from trial that the defendant Hopkins received relatively small amounts of a methamphetamine mixture, probably an eight-ball, in exchange for chemicals, glassware or equipment on at least six occasions. In addition, the court believes the defendant should be held accountable for one ounce of actual methamphetamine produced from a methamphetamine cook after January 27, 2000. The court bases this finding on the defendant's proportional involvement on January 27, 2000, in removing firearms and burying three pieces of PVC pipe taken from the Wright's residence.
>
> Like the jury in this case, the court is not convinced that it was within the scope of the defendant's particular agreement with co-conspirators to produce the large quantities of methamphetamine that Shane Wright was actually manufacturing. The evidence at trial does not persuade the court that Charles Hopkins was closely involved with the Wright's manufacturing activities or that Wright ever consulted, depended upon, or worked closely with Charles Hopkins in manufacturing or distributing methamphetamine. The court believes the extent of Charles Hopkins' agreement was simply to tender whatever chemicals and equipment he stole from Eagle Picher to Shane Wright in the hope of receiving methamphetamine. As far as Charles Hopkins' actions on January 27 and 28, the court believes that the defendant's principal motive was to protect his brother but that he understood his actions would assure he remained in the good favor of Shane Wright's ongoing conspiracy to manufacture methamphetamine. The more credible evidence at trial establishes that Hopkins' efforts that night and next day were quite limited at best and that after his arrest Shane Wright did not

continue manufacturing methamphetamine at the same or similar levels as before his arrest.  Combining Hopkins' limited role and Wright's curtailed manufacturing, the court concludes the defendant should be held accountable for one ounce of actual methamphetamine, that is, the court's proportionate estimate of the defendant's efforts at preserving the conspiracy to manufacture methamphetamine.

In the court's judgment, it seems both unreasonable and unfair in light of the evidence at trial and the jury's verdict to hold the defendant accountable for the large sums of methamphetamine manufactured by Shane Wright's extensive manufacturing conspiracy.  By calculating and estimating relevant conduct as it has, the court has attempted to preserve at least the spirit of the jury's verdict with respect to the amount of methamphetamine mixture and to hold the defendant accountable for his conduct on January 27 and 28, 2000, with respect to the estimated amount of actual methamphetamine.  The court would point out that the jury was not specifically asked nor provided with the necessary sentencing information to make the latter determination.  Though different from the relevant conduct calculations advanced in the PSR or advocated by the parties, the court's relevant conduct determination here meets the objectives of the sentencing guidelines and generally addresses the concerns being argued by the parties.

(Dk. 1668, pp. 5-8).

The Tenth Circuit concluded that in these findings, the sentencing court had "employed an improper methodology in determining drug quantity and, further, that the drug quantity determination in this case is not supported by the record."  (Dk. 1957, p. 6), *United States v. Hopkins*, 128 Fed. Appx. 51, *53 (10th Cir. Apr. 11, 2005).  The appellate court rejected the sentencing court's relevant conduct finding that had held the defendant accountable for one ounce of actual methamphetamine as the "proportionate estimate" of the defendant's involvement in

6

the conspiracy.  The panel said this methodology was not consistent with the

Guidelines or the case law in two regards:

> First, while the court was understandably concerned about the relationship
> between the amounts found by the jury and those contained in the PSR, the
> court's use of a "proportionality" analysis mixes up Hopkins's relative role in
> the overall conspiracy with the consequences that flowed from his conduct
> that helped sustain the conspiracy after January 2000. We do not mean to
> imply that consideration of Hopkins's contributory role as a factor at
> sentencing is improper. An analysis of such conduct may well affect the
> court's determination of the scope of Hopkins's involvement in the
> conspiracy or may lead the court to find the sentence should be reduced
> based on the mitigating role reductions contained in USSG § 3B1.2. It may
> also be that Hopkins's conduct dictates a drug quantity determination lower
> than the entire production between January and March 2000. Our point is,
> rather, a finding by the court that Hopkins's role in the conspiracy
> was relatively small does not excuse it from making the relevant conduct inquiries.
>
> Second, even if we were to sanction the use of proportional
> involvement analysis, there is nothing in the record indicating how the court
> determined that Hopkins's role in preserving the conspiracy properly resulted
> in him being held accountable for one ounce of methamphetamine. The
> district court provides no quantifiable guidance, such as an estimate of the
> amount of drugs produced after January 2000, to which we can tether our
> review. Because we do not know how the court arrived at this number, we
> conclude that there is insufficient evidence in the record to support the drug
> quantity determination. See United States v. Richards, 27 F.3d 465, 469
> (10th Cir.1994) (holding insufficient minimally reliable evidence in the record
> to support drug quantity determination).
>
> We therefore remand for resentencing.

*United States v. Hopkins*, 128 Fed. Appx. 51, 54-55 (Apr. 11, 2005).  Declining to

address the other arguments of the government and the defendant, the panel

concluded with the following words on *Booker*:

On remand, resentencing will be governed by the Supreme Court's recent decision in *United States v. Booker*, --- U.S. ----, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005).  After *Booker*, courts are no longer constrained by the mandatory application of the Guidelines.  Nonetheless, a sentencing court is required to "consult" the Guidelines and the factors set forth in 18 U.S.C. § 3553(a) before imposing a sentence.  *See Booker*, --- U.S. at ---- - ----, 125 S. Ct. at 764-67.  Consistent with the Booker remedial scheme, the sentencing court as fact finder should calculate the range prescribed by the Guidelines.  The court then must review the other relevant factors contained in the Guidelines, including those in § 3553(a), and impose a reasonable sentence.  *See id.*  In applying the Guidelines' factors, the court should take care to explain its reasoning, see 18 U.S.C. § 3553(c), especially if it imposes a sentence outside the Guidelines' range.  While the Guidelines are no longer mandatory, it is clear from *Booker*, --- U.S. at ----, 125 S. Ct. at 757, that the now-discretionary Guidelines will be a vital barometer of reasonableness on appellate review.

*Id.* at 56.

**GOVERNMENT'S POSITION ON RESENTENCING:**

"[T]he government respectfully submits that the only possible outcome at defendant's re-sentencing which will be both permissible and reasonable will be to sentence the defendant to a term of imprisonment for twenty years."  (Dk. 1963, pp. 12-13).  The government characterizes the defendant's involvement in the conspiracy as two-fold:  1) assisting in the manufacture of methamphetamine by providing chemicals and equipment stolen from the defendant's place of employment in exchange for methamphetamine; and 2) assisting in the concealment of evidence on January 27, 2000, located at the

residences of Shane Wright and Mike Hopkins in anticipation of a search warrant arising from the contemporary arrest of Shane Wright and Mike Hopkins.

For the first type of involvement, the government contends the defendant should be held accountable for all the methamphetamine that Wright was able to produce from the chemicals and equipment that the defendant provided to Wright. (Dk. 1963, at pp. 15-16). Starting from the date when the defendant may have first provided any chemical, equipment or glassware, the government advocates holding the defendant accountable for all methamphetamine produced by Wright's conspiracy after that date.[1] The government principally relies on Wright's testimony about general production levels achieved by his laboratory. The government posits to hold the defendant accountable only for the drugs he received in exchange for the chemicals/equipment is to sentence him only for "his personal gain from his participation in the conspiracy rather than for the significantly more serious illegal conduct that he engaged in by being an active participant in the drug manufacturing operation." (Dk. 1963, p. 15).[2] The government concludes that

---

[1]Missing from the government's arguments and evidence is what amount and kind of chemical, equipment or glassware were furnished on that date and what date they may have been first used by Wright.

[2]Assumed in the government's argument as it has been articulated without further discussion or citation is the proposition that anyone who purchases methamphetamine with ingredients or equipment that could be used in

9

"[t]he defendant should therefore be held accountable, like those in this conspiracy who were similarly situated to him, for enough methamphetamine to warrant application of base offense level of 38."  (Dk. 1963, pp. 17-18).

For the second type of involvement, the government contends in its first memorandum on resentencing that the "[d]efendant's acts of concealing evidence allowed the conspiracy to continue manufacturing methamphetamine from January of 2000 until March of 2000.  In this two-month period, Shane Wright produced approximately 16 pounds of actual methamphetamine."  (Dk. 1963, pp. 16-17).  The government cites the PSR as support for this contention.[3]  *Id*.  After the hearing on the resentencing, the government filed a supplemental sentencing memorandum conceding the evidence showed that Wright manufactured

_____

manufacturing methamphetamine necessarily is "an active participant" in the manufacture of the methamphetamine.

[3]At the original sentencing, the defendant objected to this finding in the PSR about the level of methamphetamine produced after January 27th.  The government opposed the objection arguing that "the relevant conduct determination found in the PSIR is accurate and it is both fair and appropriate given this defendant's involvement in the case.  The government recommends that the PSIR should be unchanged in this regard."  (PSR Addendum, ¶ 167).  In its written order, the court sustained the defendant's objection finding that "Shane Wright did not continue manufacturing methamphetamine at the same or similar levels as before his arrest" and that Wright's subsequent manufacturing was "curtailed."  (Dk. 1668, p. 7).  At the sentencing hearing on September 20, 2002, the government offered no additional evidence to prove production levels after January 27th.

methamphetamine only one time after his arrest in January.  (Dk. 1989, p. 9).

The government's position in its supplemental sentencing memorandum is that the defendant should be held accountable for at least nine cooks of methamphetamine with each cook yielding a minimum of 300 grams.  The nine cooks represent two cooks a month for the four months of October through January, and one cook after the arrest on January 27th.  Accounting for the purity levels of 96%, the government "respectfully submits that a base offense level of 36 is the **only** relevant conduct determination warranted by the facts of this case." (Dk. 1989, p. 13) (emphasis in original).

The government reiterates that the court correctly applied the enhancements for a firearm and obstruction of justice.  The government challenges a role reduction because the defendant's involvement is "not dissimilar from the involvement of many of the co-conspirators."  (Dk. 1989, p. 15).  With a total offense level of 40 and a criminal history category of one, the applicable guideline range is 292 to 365 months, but the statutory cap reduces the guideline range to 240 months.

In its analysis of the § 3553(a) factors, the government makes several observations.  The government considers the defendant to have been "integrally involved in a drug trafficking organization which produced a tremendous amount of

11

extremely pure methamphetamine" and to have a level of culpability comparable to

"Lonnie Pittman, Steven Keith Rawlins, and Mickey Scott Wittenmeyer." (Dk.

1989, pp. 19-20). Because these defendants pleaded guilty and cooperated with the

government, they earned reductions in their sentences to which the defendant is not

entitled. Trumpeting proportionality and objectivity, the government calls for the

defendant to receive the statutory maximum sentence of twenty years for his

conviction. The government calls a sentence of ten years "unfair and unjust" in

light of the sentences given to the other cooperating defendants of similar

culpability. "Proportionality is critical to the integrity of the criminal justice system,

and this defendant simply does not deserve a sentence as lenient as the ones

imposed on those cooperating defendants." (Dk. 1989, p. 23).

**DEFENDANT'S POSITION ON RESENTENCING**

The defendant emphasizes that the jury after hearing all of the evidence

at trial concluded the government had not proved beyond a reasonable doubt that

the defendant had "conspired to manufacture or distribute at least 50 grams or

more" of methamphetamine. The defendant asks the court to sentence him based

on the small amounts of methamphetamine (21 grams) he received by trading

equipment and chemicals from his job. The defendant believes such a sentence

would not only be consistent with the jury's verdict and but would further the spirit

12

of *Booker*.

The defendant's sentencing memorandum summarizes and argues facts that minimize his involvement in the conspiracy, that limit the scope of his conspiracy agreement, and that narrow what was reasonably foreseeable to him. With these same facts and arguments, the defendant asks for a minor role reduction. The defendant believes the reduction would be appropriate and consistent with adjustments afforded other similarly situated defendants. The defendant highlights the sentencing court's recently restored discretion under *Booker* and calls for the court to tailor a sentence in consideration of the different § 3553 factors. Finally, the defendant appeals for a sentence that does not punish him for having exercised his right to a jury trial.

**GOVERNING LAW ON RELEVANT CONDUCT**

The Supreme Court in *United States v. Watts*, 519 U.S. 148, 155-56 (1997), held that a court in sentencing a defendant could consider relevant conduct proved by a preponderance of evidence even though the conduct was underlying a charge of which the defendant was acquitted. In rendering the Guidelines advisory in *Booker*, the Court did not vitiate the force of the analysis underlying *Watts*. *United States v. Magallanez*, 408 F.3d 672, 684-85 (10th Cir.) ("Applying the logic of *Watts* to the Guidelines system as modified by *Booker*, we conclude that

13

when a district court makes a determination of sentencing facts by a preponderance

test under the now-advisory Guidelines, it is not bound by jury determinations

reached through application of the more onerous reasonable doubt standard."),

*cert. denied*, 126 S. Ct. 468 ( 2005).  While the jury's verdict on the amount of

drugs involved in the offense of conviction establishes the statutory parameters, the

sentencing court determines base offense levels under the advisory Guidelines using

the preponderance of evidence standard and considering all relevant conduct.

Sentencing accountability under the Guidelines is not the same as

criminal conspiracy liability, for the former remains focused "on the specific acts

and omissions for which the defendant is to be held accountable."  U.S.S.G. §

1B1.3, comment (n.1).   The Guidelines also contemplate that "relevant conduct is

not necessarily the same for every" conspirator.   U.S.S.G. § 1B1.3, comment.

(n.2).  In controlled substance cases, relevant conduct includes "all quantities of

contraband with which he [defendant] was directly involved and, in the case of a

jointly undertaken criminal activity, all reasonably foreseeable quantities of

contraband that were within the scope of the criminal activity that he jointly

undertook."  U.S.S.G. § 1B1.3, comment. (n.2).  The same commentary explains:

> In determining the scope of the criminal activity that the particular defendant
> agreed to jointly undertake (*i.e.*, the scope of the specific conduct and
> objectives embraced by the defendant's agreement), the court may consider

14

any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.

U.S.S.G. § 1B1.3, comment. (n.2).

In applying this commentary as the authoritative interpretation of the Guidelines, courts have developed case law paralleling it. A defendant convicted of conspiracy "is accountable for the conduct of others that is within the scope of his agreement and reasonably foreseeable by him." *United States v. Green*, 175 F.3d 822, 837 (10th Cir.), *cert. denied*, 528 U.S. 852 (1999). In other words, a conspirator is not necessarily accountable for all acts that foreseeably stem from his criminal conduct, for "accountability only extends to the criminal activity that he agreed to undertake." *United States v. Dazey*, 403 F.3d 1147, 1176 (10th Cir. 2005). Relevant conduct is limited to those reasonably foreseeable activities done in furtherance of what the defendant agreed to jointly undertake. *United States v. Melton*, 131 F.3d 1400, 1405 (10th Cir. 1997). Nor is the scope of a conspirator's "jointly undertaken criminal activity . . . necessarily the same as the scope of the entire conspiracy." *United States v. McClatchey*, 316 F.3d 1122, 1128-29 (10th Cir. 2003) (quotation and citation omitted). "In particular, '[t]he fact that the defendant is aware of the scope of the overall operation is not enough to [establish the scope of the defendant's agreement] and therefore, is not enough to hold him

15

accountable for the activities of the whole operation.'" *United States v. McClatchey*, 316 F.3d at 1129 (quoting *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002)).  "In determining the scope of the criminal activity that a defendant has agreed to jointly undertake, the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *United States v. Tran*, 285 F.3d 934, 938 (10th Cir. 2002) (quotation and citation omitted).

"Proper attribution at sentencing requires the district court to analyze, and make 'particularized findings' about, the scope of the specific agreement the individual defendant joined in relation to the conspiracy as a whole.'" *United States v. Melton*, 131 F.3d at 1404 (citations omitted).  If the defendant did not have a major role in the conspiracy, "then particularized findings about the defendant's agreement to join the conspiracy must support the scope of the defendant's role in the conspiracy." *United States v. Dazey*, 403 F.3d at 1176-77 (citation omitted). "'Even a brief finding can be sufficient if, when viewed in context, it is more than simply a generalized or conclusory finding that [the defendant] was involved in the conspiracy.'" *United States v. Kell*, 41 Fed. Appx. 350, *355 (10th Cir. 2002) (quoting *United States v. Thomas*, 114 F.3d 228, 234 (D.C. Cir.), *cert. denied*, 522 U.S. 1033 (1997)).

16

The burden is with the government to "prove by a preponderance of the evidence the factual basis for attributing the conduct of coconspirators to the defendant for sentencing purposes." *United States v. McClatchey*, 316 F.3d at 1128 (citation omitted). A sentencing court may rely on estimates in making a drug quantity determination when actual drugs have not been seized. *United States v. Ruiz-Castro*, 92 F.3d 1519, 1534 (10th Cir. 1996 (quotations omitted). The quantity determinations may be "based on a variety of circumstances, so long as they have some basis of support in the facts of the particular case." *United States v. Nieto*, 60 F.3d 1464, 1469 (10th Cir. 1995) (quotation omitted), *cert. denied*, 516 U.S. 1081 (1996). The need to estimate is not a license for guesswork. *United States v. Higgins*, 282 F.3d 1261, 1280 (10th Cir. 2002). In choosing between several plausible estimates, none of which is more likely the correct quantity, the court "must err on the side of caution." *Id*. (quotation omitted).

## SCOPE OF RESENTENCING ON REMAND

The Tenth Circuit's mandate remanded the case for resentencing, but it did not expressly state that the defendant's sentence was vacated and did not restrict the matters to be addressed on resentencing. The sentencing court entered a minute order directing the parties to file sentencing memoranda addressing all objections, arguments and issues concerning the PSR "that should be decided and

considered in resentencing because they were properly preserved on appeal and/or are proper for consideration under" *Booker*. (Dk. 1960). In this resentencing, the defendant has objected to the government having two bites at the apple and introducing evidence and arguments which were not presented at trial or at the first sentencing.

"'[W]here the appellate court has not specifically limited the scope of remand, the district court generally has discretion to expand the resentencing beyond the sentencing error causing the reversal.'" *United States v. Lang*, 405 F.3d 1060, 1064 (10th Cir. 2005) (quoting *United States v. Moore*, 83 F.3d 1231, 1234 (10th Cir. 1996)). "Resentencing on remand is typically de novo, but an appellate court may limit the district court's discretion pursuant to the mandate rule." *United States v. Keifer*, 198 F.3d 798, 801 (10th Cir. 1999) (citation omitted). In explanation of the typical scope of a remand for resentencing and the trial court's discretion inherent in conducting that proceeding, the Tenth Circuit has said:

> As this court has held, when a defendant's sentence is vacated on appeal and remanded for new sentencing, the lower court must begin anew with *de novo* proceedings. *United States v. Ortiz*, 25 F.3d 934, 935 (10th Cir. 1994). The court went on to clarify that the *de novo* resentencing "*permits* the receipt of any relevant evidence the court could have heard at the first sentencing hearing." *Id*. (emphasis added); *United States v. Warner*, 43 F.3d 1335, 1340 (10th Cir. 1994). As a consequence, the court on remand has the

discretion to entertain evidence that could have been presented at the original sentencing even on issues that were not the specific subject of the remand. *See United States v. Ponce*, 51 F.3d 820, 826 (9th Cir. 1995).  This is consistent with the parameters of the what has been labeled 'the mandate rule':  where the appellate court has not specifically limited the scope of the remand, the district court generally has discretion to expand the resentencing beyond the sentencing error causing the reversal.  *See United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994); *United States v. Cornelius*, 968 F.2d 703, 705 (8th Cir. 1992).

*United States v. Moore*, 83 F.3d at 1234 (footnote to this passage explained that this case did not "present the issue of whether the district court on remand may consider new evidence that could increase Moore's sentence.").

        In some remands for resentencing, the Tenth Circuit has denied the government a second chance to prove facts in support of a longer sentence.  In *United States v. Campbell,* 372 F.3d 1179 (10th Cir. 2004), the defendant objected at sentencing to a relevant conduct enhancement, and the government conceded on appeal that it had failed to prove the necessary elements.  The Tenth Circuit held:

The government failed to meet its burden of proof on the clearly established element of interstate nexus, and we decline to give it a second bite at the apple. *See United States v. Noble*, 367 F.3d 681, 682 (7th Cir. 2004); *United States v. Poor Bear*, 359 F.3d 1038, 1043-44 (8th Cir. 2004 (Discussing *United States v. Hudson*, 129 F.3d 994, 995 (8th Cir. 1997)). Although Defendant alerted the government to the deficiency in its evidence, the government did not seek to cure the deficiency, and instead made patently erroneous legal arguments as to why such proof was not needed. Our reversal and remand for resentencing here "does not invite an open season for the government to make the record that it failed to make in the first instance." *United States v. Torres*, 182 F.3d 1156, 1164 (10th Cir.

19

1999).

*Id*. at 1183; *but see United States v. Keifer*, 198 F.3d at 800-01 (Circuit court refused to restrict scope of resentencing based on government's failure to prove matters in original sentencing).

The Tenth Circuit has recognized that the sentencing court on remand likewise has discretion in entertaining or deciding new arguments and evidence at the resentencing. *See United States v. Fortier*, 242 F.3d 1224, 1232 (10th Cir.), *cert. denied*, 534 U.S. 979 (2001); *United States v. Earls*, 202 F.3d 283, 1999 WL 1244479, at *1 (10th Cir. 1999), *cert. denied*, 529 U.S. 1082 (2000); *United States v. Moore*, 83 F.3d at 1235. The district court has the "inherent discretion to determine the appropriate scope of the resentencing proceedings." *United States v. Moore*, 83 F.3d at 1235.

In the instant case, the district court on resentencing returned the parties to the position of having had filed their objections to the PSR with the probation officer and having had those objections addressed by the officer in the addendum to the PSR. The court then afforded the parties the opportunity again to file sentencing memoranda that addressed the unresolved objections that had been properly preserved and those additional matters now relevant under post-*Booker* sentencing. In doing so, the court returned the parties to the situation addressed in

20

Fed. R. Crim. P. 32(i) which allows parties to advance new objections to the PSR for "good cause" shown. *See United States v. Moore*, 83 F.3d at 1235. This rule plainly is an appropriate "avenue for the district court to exercise its discretion and determine the scope of the resentencing." *Id*. Thus, a sentencing court may exercise its discretion and not consider new objections, arguments and supporting evidence with regard to the PSR that were not part of the substantive sentencing error identified on appeal when good cause for the late presentation has not been shown. *See United States v. Moore*, 83 F.3d at 1235.

      The PSR calculated drug quantity as the amount of methamphetamine manufactured from January 2000 through March of 2000. As explained at ¶ 82 to the PSR, the probation officer used this date because it was "not clear from statements of codefendants in this case when the defendant began providing the chemicals and glassware to Wright." The probation officer further noted that the evidence indicated the defendant received methamphetamine in 1999. Considering that the defendant's contribution to the manufacturing conspiracy to be two-fold, providing chemicals and glassware and destroying evidence, the probation officer used the known date associated with destroying evidence in calculating drug quantity. The PSR then incorrectly assumed that the conspiracy's manufacturing levels prior to January of 2000 continued until March of 2000. The government

21

filed no objection to the PSR with regard to the drug quantity findings or

calculations.  When the defendant objected to the drug quantity calculations in the

PSR, the government referred to the defendant's involvement in providing

chemicals and glassware but offered no evidence or arguments in proof of a date

earlier than January of 2000.  (PSR Addendum, ¶¶ 155-167).  Instead, as plainly

reflected in the PSR addendum, the government took the position that "the relevant

conduct determination found in the PSIR is accurate."  (PSR Addendum, ¶ 167).

As the Tenth Circuit noted on appeal, the PSR "concluded that

Hopkins was not responsible for any of the drugs produced by the conspiracy

prior to the January 2000 concealment of evidence."  128 Fed. Appx. at *54.  The

Tenth Circuit did not address or find error in the sentencing court's reliance on that

date in calculating drug quantity.  Indeed, the Tenth Circuit even used this date

several times in discussing the relevant conduct analysis that was done at

sentencing and that would be done on resentencing:

> First, while the court was understandably concerned . . ., the court's use of a
> "proportionality" analysis mixes up Hopkins's relative role in the overall
> conspiracy with the consequences that flowed from his conduct that helped
> sustain the conspiracy after January 2000.
> We do not mean to imply that consideration of Hopkins's
> contributory role as a factor at sentencing is improper. . . .  It may also be
> that Hopkins's conduct dictates a drug quantity determination lower than the
> entire production between January and March 2000. . . .
> Second, . . ., there is nothing in the record indicating how the court

determined that Hopkins's role in preserving the conspiracy properly resulted in him being held accountable for one ounce of methamphetamine. The district court provides no quantifiable guidance, such as an estimate of the amount of drugs produced after January 2000, to which we can tether our review.

128 Fed. Appx. at *55.  In short, the Tenth Circuit did not rule that the sentencing court's use of January 2000 in calculating drug quantities was a substantive error.

The court will not entertain or decide the government's latest attempt at proving a date earlier than January 26, 2000, for the defendant's involvement in the conspiracy.  The government has not carried its burden of showing good cause for waiting until now to come forth with evidence and arguments that were readily available for presentation at the original sentencing.  Nor is there anything of record to show either diligence or a good faith reason for the government's delay in making and pursuing this objection to the PSR.  *See United States v. Albright*, 115 F. Supp. 2d 1271, 1275 (D. Kan. 2000).

At the resentencing hearing, the government conceded it had not done a good job at trial at establishing "a time frame" for the defendant's "involvement with the conspiracy."  (Dk. 1982, pp. 3-4).  The government further admitted it understood at the original sentencing that the court was "more interested–and understandably so–in the time frame in which this defendant participated."  *Id*. at 4. What the government overlooks addressing is its justification for failing to prove

23

this time frame at the first sentencing even though it was arguing then and now that the defendant should be held accountable for all methamphetamine manufactured by the conspiracy during the defendant's participation.  The court finds no good cause for the government's failure to make and pursue a timely objection to the drug quantity determination found in the PSR and to offer the proof it now wants the court to consider on resentencing.

The court's exercise of its discretion has been influenced by certain circumstances in this case that weigh against the government getting a second bite at the apple.  At the original sentencing, the government consciously chose not only to withhold any objection to the PSR on this issue but also to represent in response to the defendant's objection that the PSR accurately, fairly and appropriately determined relevant conduct and the defendant's involvement in this case.  (PSR, ¶ 167).  The government further recommended "that the PSIR should be unchanged in this regard."  *Id*.  The government advanced such positions though it knew or should have known[4] the weight of the evidence did not support the PSR's

_____

[4]Based on intercepted telephone calls, law enforcement officers had averred in pleadings filed with the court that Wright had curtailed his production of methamphetamine and that his regular contacts were eager for him to resume production.  At the resentencing hearing, Wright testified in his direct examination conducted by the government to manufacturing methamphetamine only one time between his arrests in January and March of 2000.  The yield from this cook was

24

assumption that Johnny Shane Wright's production levels after his arrest in January of 2000 were the same as before his arrest.  The government also understood from the court's memorandum and order filed September 20, 2002, that the court believed the more credible evidence at trial was that Wright's manufacturing was significantly curtailed after his arrest.  Despite this knowledge, the government chose not to present evidence at the first sentencing and even argued initially on remand, as reflected in its first sentencing memorandum, that the court should rely on these erroneous calculations and findings in the PSR:

> Defendant's acts of concealing evidence allowed the conspiracy to continue manufacturing methamphetamine from January of 2000 until March of 2000. In this two-month period, Shane Wright produced approximately 16 pounds (7.25 kilograms) of actual methamphetamine.

(Dk. 1963, pp. 16-17).  Though alerted of the deficiency in its evidence at the first sentencing, the government did nothing to cure the deficiency and, instead, argued in favor of an assumption that was unsupported by the weight of the evidence. Thus, the court does not find the equities of this case favor "invit[ing] an open season for the government to make the record that it failed to make in the first instance."  *United States v. Campbell*, 372 F.3d at 1183.

**FINDINGS AND ANALYSIS**

---

approximately 400 grams.

*BASE OFFENSE LEVEL*

For offenses involving drugs, the Sentencing Guidelines attach nearly overwhelming significance to the drug quantity determination. Being an evidentiary proposition that is both logical and objectively quantifiable in most instances, the amount of drugs involved in a case is typically a reliable indicator or measure of the seriousness of the offense. It has been this court's experience that in cases involving a conspiracy to manufacture drugs this effort to quantify can result in embarking down roads not so clearly marked by precedent and sometimes poorly lighted by the evidence. This case typifies the court's experience in that regard.

The court's prior ruling quantified the drugs based on the defendant's involvement in two ways. First, the court determined the amount of methamphetamine which the defendant received from bartering chemicals, glassware and equipment. Second, the court held the defendant accountable for a proportional estimate of the amount of methamphetamine manufactured by the conspiracy after the arrest in January of 2000 based on his efforts at concealing evidence of the Wright's manufacturing activities. The Tenth Circuit reversed and remanded finding error in the second determination, and the government wants the court to revisit the first determination. For the reasons stated earlier, the court will revisit the first determination only insofar as the conspiracy's activities after January

26

26, 2000.

There is no factual dispute that the defendant's connection to the conspiracy is two-fold.  The defendant provided to Shane Wright an unspecified amount of liquid chemicals, some glassware (a filtering funnel and other items not as well identified), respirator masks, and a set of scales.  The defendant also went to Shane Wright's residence following the January arrest and assisted in removing and concealing evidence of the manufacture of methamphetamine.  The court shall consider both aspects in determining the quantity of methamphetamine with which the defendant was directly involved and the reasonably foreseeable quantity of methamphetamine that was within the scope of the criminal activity that he jointly undertook.

The court's impression of the evidence concerning the defendant's activity in providing chemicals and equipment is that the defendant intended only to use these items to barter for small amounts of methamphetamine from the manufacturer knowing the items could be used to manufacture methamphetamine but that the defendant had not agreed to jointly undertake the manufacture of large amounts of methamphetamine.  This impression is consistent with the jury's verdict.  The evidence establishes the defendant acted upon the knowledge that Shane Wright was manufacturing methamphetamine and that his employment with

27

Eagle Pitcher gave him access to items which Wright might accept as tender for methamphetamine.  In the government's estimation, once the defendant bartered his first item, he jointly agreed to manufacture every ounce of methamphetamine thereafter produced by Shane Wright.[5]  The evidence peculiar to this case does not sustain the government's claim to sweeping inferences of joint undertaking and reasonable foreseeability.

There is no evidence to show the defendant regularly provided certain items, was regularly contacted to furnish certain items, or was ever made aware of Shane Wright's schedule or plans for cooking methamphetamine with the provided items.  Instead, the defendant just showed up with glassware, equipment or chemicals in the hope that Shane Wright would want them and would pay him with methamphetamine.  The government did not prove that the defendant attended any methamphetamine cook, that the defendant knew how to cook methamphetamine, or even that the defendant necessarily knew what was needed to

_____

[5]Frankly, the government's approach attaches controlling significance to the nature of the consideration without regard for any number of other circumstances quite relevant in determining the scope of a conspiratorial agreement, such as the defendant's knowledge of the conspiracy and its objectives and scope;  the extent, length and importance of the defendant's involvement in the conspiracy; and his relationship to co-conspirators and the comparative level of trust, responsibility and reliance placed on him.

cook methamphetamine. So, how did the defendant know what to tender? Shane

Wright testified that on occasion he would mention in the presence of the defendant

about needing something and that the defendant sometimes would bring what the

defendant thought Shane Wright had mentioned or would bring other things

expecting to exchange them for methamphetamine. The court's impression of

Shane Wright's testimony, however, is that the defendant frequently showed up

with items which could not be used, because they were the wrong size, shape, or

kind. Shane Wright testified that he still paid the defendant for the wrong items, but

he varied the amount of methamphetamine with the value and usefulness of what

was tendered and that he never paid the defendant with more than an eight ball.

Shane Wright further testified that he would not have given anything but

methamphetamine for the items that the defendant brought him. While Wright did

supply cash to some of his co-conspirators for what they provided, Wright

obviously did not consider what the defendant brought to be important enough to

justify a cash outlay. The evidence offered at the resentencing hearing does not

convince the court to change its previous finding:

> Like the jury in this case, the court is not convinced that it was within
> the scope of the defendant's particular agreement with co-conspirators to
> produce the large quantities of methamphetamine that Shane Wright was
> actually manufacturing. The evidence at trial does not persuade the court
> that Charles Hopkins was closely involved with the Wright's manufacturing

29

activities or that Wright ever consulted, depended upon, or worked closely
with Charles Hopkins in manufacturing or distributing methamphetamine.
The court believes the extent of Charles Hopkins' agreement was simply to
tender whatever chemicals and equipment he stole from Eagle Picher to
Shane Wright in the hope of receiving methamphetamine.

(Dk. 1668, pp. 6-7).  As set forth in its prior order, the court attributed 21 grams of

a methamphetamine mixture for the defendant's bartering of chemicals, glassware

and equipment.

        In answering the co-conspirator's request to assist in removing and

concealing evidence from Shane Wright's residence on January 26 and 27, 2000,

the defendant Charles Hopkins jointly undertook to become more closely involved

in the conspiracy to manufacture methamphetamine.  Prior to that time, the

defendant had displayed little more than an agreement occasionally to barter for

personal amounts of methamphetamine with items that he happened to steal from

Eagle Pitcher and hoped would be tender acceptable to Shane Wright.  In removing

and destroying or concealing evidence of the manufacture of methamphetamine at

Wright's residence, the defendant, however, knowingly agreed to become directly

involved in preserving and promoting Wright's efforts to manufacture more than

the methamphetamine provided to the defendant.  Even so, the court remains

convinced that the defendant's principal motive behind his actions on January 26th

and 27th "was to protect his brother."  (Dk. 1668, p. 7).

In jointly undertaking to preserve, protect and promote Wright's conspiracy to manufacture, the defendant is accountable for all quantities of methamphetamine that are within the scope of that undertaking and are reasonably foreseeable in connection with the undertaking. As stated earlier, Shane Wright testified that he cooked methamphetamine only once after his arrest in January and before the conspiracy ended with the arrests in March of 2000. The yield from that cook was approximately one pound or 400 grams. The government has not carried its burden of proving, however, that it was reasonably foreseeable to the defendant that Shane Wright's cooks would yield this amount of methamphetamine. That the defendant provided industrial-grade chemicals or glassware of a particular size provides no reliable basis for inferring that the defendant necessarily knew or should have known the amount of methamphetamine that Wright produced in a cook. On the other hand, the record does include evidence that Shane Wright paid the defendant with methamphetamine from Wright's "personal stash," that Wright and the defendant used methamphetamine from this stash, and that there would have been times that the defendant saw Wright's "stash." Consequently, the defendant knew the size of the stash and knew the methamphetamine in it was safe for direct use. There is also persuasive evidence the defendant knew this methamphetamine was pure enough that it could be diluted again and sold. Wright

31

testified his stash usually had four ounces but on occasion would be as small as two ounces.  (Dk. 1982, pp. 27-28).  Thus, it was reasonably foreseeable to the defendant that Wright's conspiracy had manufactured the sums observed in the personal stash and that this methamphetamine had been diluted for safe personal use.  Erring on the side of caution, the court finds it was reasonably foreseeable to the defendant by his joint undertaking that Wright would cook at least two ounces of methamphetamine.[6]  Taking into account Wright's yield of 96% purity, the result is 54.4 grams and a base offense level of 28.[7]

<em>Sentencing Enhancements</em>

Following the Tenth Circuit's mandate, the court will consider the defendant's claims that the government submitted insufficient evidence to sustain the sentencing enhancements for possession of a firearm and obstruction of justice.

---

[6]The defendant points to Shane Wright's testimony that he was phasing out the defendant's and Mike Hopkins' involvement in the conspiracy after the arrest in January of 2000.  This testimony does not establish that the defendant had withdrawn from the conspiracy or that the last cook of methamphetamine was not within the scope of the defendant's joint undertaking.  It also was reasonably foreseeable to the defendant that by destroying and concealing evidence at Wright's residence he was protecting and preserving Wright's opportunity to cook at least one more time.

[7]The conspiracy charged in count one did not include the defendant's act of concealing evidence on January 27 and 28, 2000.  (Dk. 1757, p. 5).  Thus, the court in attributing a quantity of drugs for this relevant conduct is deciding a matter not presented to the jury.

On resentencing, the defendant opposed these enhancements in his sentencing memoranda, and the government responded that the facts as proved at trial establish both enhancements.

**Possession of Dangerous Weapon**. Section 2D1.1(b)(1) provides: "If a dangerous weapon was possessed (including a firearm), increase by 2 levels." The application notes explain that "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, cmt. n. 3. The term, "offense," is defined under the guidelines as the "conviction and all relevant conduct under § 1B1.3 (Relevant Conduct)." U.S.S.G. § 1B1.1 note 1(l). Thus, in determining whether to apply a sentence enhancement, the district court must consider all relevant conduct. *See United States v. Washington*, 11 F.3d 1510, 1516 (10th Cir. 1993), *cert. denied*, 511 U.S. 1020 (1994).

The government has the initial burden to prove the defendant's possession by a preponderance of the evidence. *United States v. Pompey*, 264 F.3d 1176, 1180 (10th Cir. 2001), *cert. denied*, 534 U.S. 1117 (2002). The government can meet this burden by showing "'that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant.'" *Id*. (quoting *United States v. Roederer*, 11 F.3d 973, 982 (10th Cir. 1993)). "[M]ere

proximity to the offense" may suffice. *United States v. Humphrey*, 208 F.3d 1190,

1210 (10th Cir. 2000).  In other words, it may be enough to prove that "the weapon

was located nearby the general location where drugs or drug paraphernalia are

stored or where part of the transaction occurred." *United States v. Flores*, 149

F.3d 1272, 1280 (10th Cir. 1998) (internal quotation omitted), *cert. denied*, 525

U.S. 1092 (1999).  If the government meets this burden, "[t]he enhancement is

appropriate unless the defendant proves it is clearly improbable the weapon was

connected with the offense."  *United States v. Dickerson*, 195 F.3d 1183, 1188

(10th Cir. 1999) (citation omitted).

        The PSR bases this enhancement on the findings that the defendant

removed several firearms from Shane Wright's residence on January 26 and 27,

2000, when he assisted Tracy Wright and others in removing, concealing and

destroying evidence that methamphetamine was being manufactured at Wright's

residence.  In support of his objection, the defendant cites his own testimony

denying he took guns from Wright's residence and Tracy Wright's testimony

admitting she did not watch him actually load items into his truck.  The defendant

also excerpts Shane Wright's narrow admission that he did not know whether the

defendant actually removed guns from his residence in January.

        With the exception of his own trial testimony, what the defendant cites

34

in support of his objection is trial testimony that when placed in context proves the defendant possessed Shane Wright's firearms in January of 2000.  While testifying that she didn't actually see the defendant put the items in his truck, Tracy Wright did say she handed the defendant certain items, including guns, and that the defendant told her he put the items in his truck.  (Dk. 1345, pp. 177-78).  Shane Wright testified that he did not know whether the defendant had taken his guns on January 26 or 27, 2000, but that he later received from the defendant some of his guns taken that night.  (Dk. 1341, pp. 296-97).  The defendant's denial that he took Wright's gun is not credible.  The defendant admitted at trial to taking an illegal gun from his brother's house before he went to Wright's residence that night, (Dk. 1410, p. 202), and also explained that in one recorded telephone call he was asking Tracy Wright whether she had removed all of Shane Wright's guns as he was worried about the guns, (Dk. 1410, p. 287-88).  Mike Hopkins also testified the defendant had told him about January 26 and 27, 2000, and admitted to taking some of Wright's guns.  (Dk. 1347, pp. 43-44).  By a preponderance of the evidence, the court finds the defendant handled and possessed certain firearms so that officers would not find them in the event a search warrant was executed on Wright's property following Wright's arrest for possession of methamphetamine. The defendant's possession of the firearms was part of an effort to conceal,

35

protect and promote Wright's drug-related activities at his residence.  In light of the trial testimony of Shane Wright, Tracey Wright, and Mike Hopkins concerning the defendant's possession of Wright's firearms, the court is persuaded that the government has carried its initial burden of proof for this enhancement and that the defendant has not shown it is clearly improbable the weapons were connected to the offense.  The defendant's objection to this enhancement is overruled.

**Obstruction of Justice**.  Section 3C1.1 requires a two-level increase in the base offense level "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense."  U.S.S.G. § 3C1.1. Application note three sets forth examples of the kind of conduct that would warrant this enhancement, including:  "destroying or concealing . . . evidence that is material to an official investigation or judicial proceeding (*e.g.*, shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so."  U.S.S.G. § 3C1.1, comment. (n.3(d)).  Thus, if during the investigation of an offense the defendant willfully destroys or conceals evidence that would be material to the official investigation, it is appropriate to assess a two-level enhancement for obstructing the administration of justice.

36

The PSR bases this enhancement on the defendant having destroyed and hidden evidence of Wright's methamphetamine manufacturing operation on January 26 and 27, 2000, following the arrest of Wright and Mike Hopkins for possession of methamphetamine. The defendant denies he destroyed evidence or knowingly secreted evidence. The defendant emphasizes the evidence at trial that he did not know what was in the PVC pipes taken from the Wright's residence and buried at another location.

Tracy Wright testified that on the night of January 26 or 27, 2000, the defendant spent several hours at their residence and she handed the defendant various illegal items that were part of the methamphetamine operation and expected him to conceal those items. The defendant admitted at trial to taking certain tubes of PVC pipe from Wright's house, burying the tubes, drawing a map to locate the buried tubes, and keeping the map until he gave it to Shane Wright about two weeks later. (Dk. 1410, pp. 202-04). The defendant also testified that when Tracy Wright handed him the tubes and told him to hide or bury them, he inferred that the tubes contained "something illegal." *Id*. at 258-59.

From the evidence at trial, including the defendant's own admissions, the court finds the defendant intentionally concealed what he believed was material evidence of Shane Wright's methamphetamine operation in order to prevent

37

officers from finding the evidence in the investigation he expected to follow from

Wright's recent arrest for possession of methamphetamine.  The obstruction

enhancement does not require proof that the defendant actually knew the precise

contents of the tubes.  It is enough that the defendant believed the tubes contained

material evidence of Wright's manufacturing conspiracy, and the evidence at trial

establishes this point.  The defendant's objection to this two-level enhancement is

overruled.

      **Minor Role**.  A minor participant reduction applies to "any

participant who is less culpable than most other participants, but whose role could

not be described as minimal."  U.S.S.G. § 3B1.2, comment. (n.3).  This inquiry

must "focus upon the defendant's knowledge or lack thereof concerning the scope

and structure of the enterprise and of the activities of others involved in the

offense."  *United States v. Calderon-Porras*, 911 F.2d 421, 423-24 (10th Cir.

1990).  The defendant has the burden of proving his minor participation. *United

States v. Harfst*, 168 F.3d 398, 401-02 (10th Cir. 1999).

      The court finds that the evidence at trial sustains a two-level minor role

reduction.  In its opening statement to the jury, the government described Charles

Hopkins as "a small player in this drug case" who was involved "on a much smaller

scale," who received "small quantities" of free drugs for the chemicals and

equipment he provided, and who "was not a high roller" but sold drugs "primarily

to support his own habit." (Dk. 1757, p. 4-5). The evidence at trial was consistent

with these characterizations. The defendant was involved in the conspiracy for a

relatively brief period. He never attended a methamphetamine cook and was not

known by a conspirator who occasionally attended those cooks. He frequently

just showed up with items to barter for methamphetamine and sometimes provided

items that were unusable by reason of size and shape. The defendant received only

methamphetamine for the items he provided and the payment was a relatively small

amount of methamphetamine. The evidence indicates the defendant lacked

knowledge about the scope or structure of Wright's manufacturing conspiracy.

There is little doubt that the defendant's knowledge of the conspiracy was

substantially less than most of the other co-conspirators and in particular the co-

conspirator Rhonda Hibbard who the government subsequently agreed was entitled

to a minor role reduction.[8] The defendant was not considered part of Wright's

distribution of methamphetamine. The defendant exercised no decision-making

role in the conspiracy, did not share in sale proceeds, and did not receive any

regular share from Wright's methamphetamine cooks. The court sustains the

---

[8]The court will discuss Rhonda Hibbard's knowledge and participation in the conspiracy later in the order.

defendant's objection to the PSR and applies a two-level minor role reduction under U.S.S.G. § 3B1.2(b).

The defendant made additional objections to the PSR at the original sentencing. The Tenth Circuit neither discussed those objections nor directed their reconsideration on remand. The defendant did not brief or argue the other objections in his submissions on resentencing. The sentencing court will not revisit those prior objections but affirms its prior rulings to the extent consistent with this order.

The above rulings results in a total offense level of 30 (base offense level of 28, plus a two-level enhancement for possession of a firearm, plus a two-level enhancement for obstruction of justice, and less a two-level reduction for minor role). With a criminal history category of one, the sentencing range is 97 to 121 months.

## POST-*BOOKER* DISCRETIONARY REGIME

After *United States v. Booker*, 125 S. Ct. 738, 767 (2005), sentencing courts no longer mandatorily apply the guidelines but rather consult them and "take them into account" along with the other factors set forth in 18 U.S.C. § 3553(a) when sentencing. Put another way, sentencing courts are to consult the Guidelines in fashioning sentences, but they are not required to sentence within the Guidelines

range.  *United States v. Gonzalez-Huerta*, 403 F.3d 727, 731 (10th Cir.) (en banc),

*cert. denied*, 126 S. Ct. 495 (2005).  A sentencing court now determines first the

appropriate sentencing range under the Guidelines and makes the factual findings

necessary to that determination.  *United States v. Serrata*, 425 F.3d 886, 920 (10th

Cir. 2005).  This sentencing range and the other factors described in 18 U.S.C. §

3553(a) are considered in imposing the sentence.  If the sentence is outside the

range under the Guidelines, the court should explain its reasons for the departure,

as required by 18 U.S.C. § 3553(c)(2).  *See United States v. Serrata*, 425 F.3d at

920.  In short, sentencing "courts are still required to consider Guideline ranges,

which are determined through application of the preponderance standard, just as

they were before. The only difference is that the court has latitude, subject to

reasonableness review, to depart from the resulting Guideline range."  *United States*

*v. Magallanez*, 408 F.3d at 685 (citations omitted).

        A sentencing court must consider the following factors under §

3553(a):  the nature and circumstances of the offense; the history and

characteristics of the defendant; the need for the sentence imposed to reflect the

seriousness of the offense, provide just punishment, afford adequate deterrence,

protect the public, and provide the defendant with needed correctional treatment;

the sentencing range established under the applicable Sentencing Guidelines; the

41

pertinent policy statements; the need to avoid unjustified sentence disparities among

defendants with similar criminal histories and found guilty of similar conduct; and

the need to provide restitution. *See United States v. Contreras-Martinez*, 409 F.3d

1236, 1242 n.3 (10th Cir. 2005). To the extent there is tension or incongruity

among the statutes and guidelines about these sentencing factors and their

consideration, the significance of it after *Booker* "diminishes as sentencing judges

are encouraged to exercise their discretion." *United States v. Serrata*, 425 F.3d at

919.

      *Nature and Circumstances of the Offense.* The quantity and quality

of the methamphetamine manufactured by the conspiracy charged in the indictment

evidence the seriousness of the offense. The weight of the evidence found

persuasive by this court, however, shows the defendant was brought into the

conspiracy by his brother for a limited role, and the defendant served in that role

with mixed results for a relatively brief period of time. The evidence concerning the

quantity and quality of what the defendant provided is too vague, for this court to

conclude that the defendant played a substantial role in the ongoing conspiracy. As

stated earlier, the court's impression was that the defendant's involvement in

destroying and concealing evidence from Wright's residence was motivated in large

part by a misguided attempt to protect his brother. The defendant's distribution of

methamphetamine appears to have been confined to family and friends and then
only occasional small amounts.  The nature and circumstances of the defendant's
offense simply are not deserving of the statutory maximum sentence that the
government adamantly claims is "the only possible outcome . . . which will be both
permissible and reasonable . . . ."  (Dk. 1963, p. 12).

   *History and Characteristics of the Defendant*.  At his original
sentencing, the defendant advanced several arguments for a downward departure
that fall within the scope of this factor.  While on pretrial release, the defendant
tested positive for methamphetamine and his bond was revoked.  The defendant
was released from custody to complete a residential substance abuse treatment
program.  Following his successful completion of the program, the defendant was
released on bond, and all subsequent drug tests were negative.  Of course, the
impact of this circumstance is offset by the defendant's trial testimony about his
infrequent and minimal prior use of methamphetamine.  The defendant's
employment history, while not extraordinary, was continuous and noteworthy,
including nine years with Eagle-Picher Technologies where, in the opinion of the
Joplin plant manager, he was "a model employee . . . at this plant" with a strong
work ethic and ability to cooperate with others.  The defendant completed four
years of service in the United States Army, and he reports receiving medals and

commendations during his service.  Letters from families and friends speak to the

defendant's honest character and dedicated concern for his family.  All of these

facts certainly distinguish the defendant from many of his co-conspirators and from

what this court would consider an offender deserving a statutory maximum

sentence.

*Sentencing Goals and Needs:  Seriousness of the Offense, Just*

*Punishment, Adequate Deterrence, Public Protection, and Correctional*

*Treatment.*  Considerations related to these factors do not counsel a sentence

different from that recommended by the Guidelines as calculated in this order.  A

sentence of nine years is substantial, provides adequate deterrence, and protects the

public, all without being impermissibly greater than necessary.  This sentence also

provides the defendant with the opportunity for some productive years of work

following his release.

*Sentencing Range under the Applicable Guidelines.*  The court

believes it has appropriately and reasonably calculated the sentencing range of

97 to 121 months.  Though relegating the Guidelines to an advisory or discretionary

status, the Supreme Court in *Booker* expressed its hope that the new sentencing

approach would "maintain[] a strong connection between the sentence imposed

and the offender's real conduct-a connection important to the increased uniformity

of sentencing that Congress intended its Guidelines system to achieve." *United States v. Booker*, 125 S. Ct. 757.  Apparently building on this expressed hope, the circuit panel in its unpublished opinion in *Hopkins* said "it is clear from *Booker*, 125 S. Ct. at 757, that the now-discretionary Guidelines will be a vital barometer of reasonableness on appellate review." *United States v. Hopkins*, 128 Fed. Appx. at 56.  Plainly, the Guidelines remain "important to the overall reasonableness of any sentence imposed by a court post-*Booker*," *United States v. Taylor*, 413 F.3d 1146, 1152 (10th Cir. 2005) (citation omitted), to the point of "exert[ing] gravitational pull on all sentencing decisions," *United States v. Trujillo-Terrazas*, 405 F.3d 814, 819 (10th Cir. 2005).  Because the Guidelines were designed to offer a desirable uniformity in sentencing, courts should pay particular attention to the calculated sentencing range in settling on a reasonable sentence.

   *Need to Avoid Unwarranted Sentence Disparities.*  Prior to *Booker*, a disparity resulting from the proper application of the Guidelines was justified and, therefore, was not a permissible reason for a departure from a properly calculated sentencing range.  *See United States v. Meza*, 127 F.3d 545, 549-50 (7th Cir. 1996), *cert. denied*, 522 U.S. 1139 (1998); *cf United States v. Contreras*, 180 F.3d 1204, 1210 (10th Cir.) (quoting *United States v. McMutuary*, 176 F.3d 959, 965-66 (7th Cir. 1999) ("'justified disparities [can] never serve as a basis for a departure

from the Guidelines sentencing range'")), *cert. denied*, 528 U.S. 904 (1999).  This

is one of the sentencing factors after *Booker* that has "'a new vitality in channeling

the exercise of sentencing discretion.'"  *United States v. Delacruz-Soto*, 414 F.3d

1158, 1166-67 (10th Cir. 2005) (quoting *United States v. Trujillo-Terrazas*, 405

F.3d at 819).  Disparities are warranted when the defendants were convicted of

different offenses or played significantly different roles in the offense.  *United*

*States v. Contreras*, 180 F.3d at 1210.

   In arguing for proportionality and for comparing the defendant's

conduct to other conspirators, the government highlights the significance of this

factor to this case.  The government submits the defendant's role was integral to

the conspiracy and is comparable to those other members who would have

received sentences of twenty years or more if they had not cooperated with the

government and entered guilty pleas.  The government offers Lonnie Pittman,

Mickey Wittenmyer and Keith Rawlins as examples of co-defendants with roles

comparable to the defendant.

   The court disagrees with the government's assessment of those co-

defendants sharing similar levels of culpability and involvement to the defendant.

Based on the evidence admitted at trial, on the government's opening statement at

trial, and on uncontested representations appearing in other court filings, the court

finds that all three of the co-defendants named by the government were more

culpable, were more closely involved with the conspiracy, and played significantly

more important and trusted roles in the conspiracy.  For example, Pittman and

Rawlins were long-time acquaintances or friends of Shane Wright, were involved

with Wright's conspiracy for a longer period than Charles Hopkins, and were paid

regular shares from each methamphetamine cook.  On more than one occasion,

Pittman took cash provided by Wright and traveled to other states where he

purchased large amounts of red phosphorous or glassware.   Trusted with cash to

purchase large amounts of certain items immediately needed, Pittman obviously

played a more integral role in the conspiracy and frequently visited Wright's place.

Rawlins supplied the location for Wright to cook the methamphetamine and

occasionally was present at a cook and assisted with cleaning up and destroying

evidence of the cook.  Nor is Wittenmyer an appropriate comparator, as he was

held accountable only for his distribution activities in amounts substantially larger

than anything received or distributed by Charles Hopkins and for a period longer

than Hopkins.  The sentences imposed on Pittman and Wittenmyer were also

influenced by their criminal histories.

        Absent from the government's identification of similarly situated

defendants is Rhonda Hibbard.  Mike Hopkins introduced her to Wright as a friend

47

who worked as a chemist.  Beginning in the summer of 1999, Hibbard furnished

Wright with industrial grade chemicals and with equipment used in Wright's

methamphetamine laboratory.  Using her skills as a chemist, Hibbard gave advice to

Wright on improving his manufacturing process and even attended at least two

cooks to offer advice.  They worked together to improve the purity of the

conversion process.  Hibbard received small amounts of methamphetamine in

exchange for the items and help she gave to Wright.  For Hibbard's sentence, the

parties essentially agreed to a base offense level of 38, to no special skills

enhancement, and to reductions for safety valve, acceptance of responsibility and

minor role.  The resulting guideline range was 108 to 135 months.  Based on the

government's 5K recommendation, the court sentenced Hibbard to 54 months

imprisonment.  Hibbard entered her plea relatively late in the case and did not testify

at trial.  The court understands that the defendant Hibbard was unique insofar as

her post-offense conduct and community support.

Though the evidence establishes that Rhonda Hibbard was more

closely involved in and knowledgeable of the manufacturing process and even

directly attended and assisted in the same, Hibbard most closely resembles Charles

Hopkins in that both of them provided industrial chemicals and glassware and

received small amounts of methamphetamine in return.  The evidence suggests that

48

Hibbard may have provided more of these items and for a longer period of time. Her ongoing advice and assistance to Wright's manufacturing methods can hardly be characterized as less significant than Hopkins' help on January 26 and 27 in hiding and destroying evidence. In view of the government's pleas for proportionality and the sentencing factor on avoiding unwarranted disparities, the court gives significant weight to the sentence given to Hibbard after taking into account her limited cooperation with the government and her unique post-offense circumstances.

**IMPOSITION OF SENTENCE**

After giving careful consideration to the Guideline sentencing range and the other factors under § 3553(a), this court determines that a sentence of 108 months falls within the calculated sentencing range[9] and comports with the different sentencing considerations relevant here. Such a sentence does not fail to capture the seriousness and harm associated with Wright's manufacturing conspiracy. This sentence is consistent with the persuasive weight of the evidence that shows the

---

[9]Assuming for the sake of argument that the court had accepted the government's position for a base offense level of 38 by holding the defendant accountable for more actual methamphetamine, the court would not have imposed a sentence longer than 108 months because of the other sentencing factors fully discussed above.

defendant to have played only a minor and limited role in Wright's conspiracy.  Of

particular importance to this court, this sentence avoids an arguably unwarranted

disparity in sentencing and is reasonably tailored in consideration of the

defendant's individual circumstances.

IT IS THEREFORE ORDERED that on January 18, 2006, at 9:30

a.m., the court intends to sentence the defendant to a term of imprisonment of 108

months;

IT IS FURTHER ORDERED that this memorandum and order shall

constitute the court's determinations pursuant to Fed. R. Crim. P.  32(i)(3) and its

statement of reasons pursuant to 18 U.S.C. §  3553(c).

Dated this 14th day of December, 2005, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge